## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No. 17-_____ (___) |
| Debtor in a Foreign Proceeding. | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN
## PROCEEDING AND RELATED RELIEF

Svitlana Romanova is the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**")[2] under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative has commenced this case ancillary to the English Proceeding and respectfully files this *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") seeking, pursuant to sections 105(a), 1507, 1515, 1517, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), the entry of an order, in the form of the proposed order (the "**Proposed Order**") annexed hereto as Exhibit A, (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code, and (ii) giving full force and effect to the Scheme in the United States if such Scheme is

---

[1]  The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Nassaulaan 2A, 2514 JS, 'S-Gravenhage, The Netherlands.

[2]  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Scheme.  A copy of the Scheme, and certain other documents relating to the Scheme, are attached as exhibits to the *Declaration of Daniel J. Guyder In Support of Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Guyder Declaration**") dated January 17, 2017 and filed contemporaneously herewith.

duly approved by the requisite majority of affected creditors and sanctioned by an order of the High Court (the "**Sanction Order**") in accordance with the English Companies Act.

As described in the Convening Order of the High Court dated January 17, 2017 (the "**Convening Order**"),[3] two meetings of affected creditors to vote on the Scheme will be held on February 6, 2017 (the "**Scheme Meetings**") and a hearing to consider whether to sanction the Scheme and thereby make it binding in England and Wales is scheduled for February 8, 2017 (the "**Sanction Hearing**").  The effect of the Scheme will be to implement a restructuring proposal of the Notes and the PXF Facilities for the benefit of the Debtor's creditors and other stakeholders by avoiding formal liquidation proceedings and to repay the full amount due to the Notes Scheme Creditors in accordance with the terms of the New Notes and the PXF Scheme Creditors in accordance with the terms of the Amended and Restated PXF Facility (capitalized terms as defined below).  The Foreign Representative is filing the Petition prior to the Sanction Hearing and entry of the Sanction Order in an effort to align this ancillary case as closely as possible with the English Proceeding and ensure seamless implementation of the Scheme.  The relief requested by the Foreign Representative with respect to the Scheme is conditioned on the prior entry of the Sanction Order by the High Court.  If the Sanction Order is entered, a copy will be promptly filed with this Court.

In support of the Petition, the Foreign Representative respectfully states as follows:

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C.

---

[3]    A copy of the Convening Order is annexed as <u>Exhibit B</u> to the Guyder Declaration.

§ 157(b)(2)(P).  Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3) because the Debtor's principal asset in the United States is the shares of capital stock it owns in Metinvest U.S., Inc., a Delaware corporation, which is deemed to be located in Delaware,[4] and it is otherwise consistent with the interests of justice and convenience of the parties, having regard for the relief sought by the Foreign Representative.  The statutory predicates for the relief requested herein are sections 105(a), 1507, 1515, 1517, and 1521 of the Bankruptcy Code.

## BACKGROUND

### *Procedural Posture*

1.      On January 13, 2016, the Foreign Representative filed a petition in this Court seeking, among other things, enforcement of the Debtor's scheme of arrangement (the "**First Moratorium Scheme**") under the English Companies Act which was sanctioned by the High Court on January 29, 2016 and provided for a moratorium against enforcement action by holders of the Notes in respect of certain events of default through May 27, 2016.  On February 8, 2016, this Court approved the petition and entered an order giving full force and effect to the First Moratorium Scheme in the United States.  *See In re Metinvest B.V.*, Case No. 16-10105 (LSS) (Bankr. D. Del. Feb. 8, 2016) [D.I. 34].[5]

2.      On June 8, 2016 the Foreign Representative filed a petition in this Court seeking, among other things, enforcement of the Debtor's scheme of arrangement (the "**Second Moratorium Scheme**") under the English Companies Act which was sanctioned by the High Court on June 30, 2016 and provided for a moratorium against enforcement action by holders of

---

[4]    8 Del. C. Section 169.

[5]    On January 29, 2016, this Court entered an order enforcing the First Moratorium Scheme on a provisional basis pursuant to sections 105(a) and 1519 of the Bankruptcy Code to avoid a gap in protection arising from the 21-day notice period required by the Federal Rules of Bankruptcy Procedure and the sanctioning of the First Moratorium Scheme by the High Court.  *In re Metinvest B.V.*, Case No. 16-10105 (LSS) (Bankr. D. Del. January 29, 2016) [D.I. 28].

the Notes in respect of certain events of default through September 30, 2016 (subject to extension to November 30, 2016 at the latest, or early termination in each case in accordance with terms in the Scheme).  On June 30, 2016, this Court approved the petition and entered an order giving full force and effect to the Second Moratorium Scheme in the United States.  *See In re Metinvest B.V.*, Case No. 16-11424 (LSS) (Bankr. D. Del. June 30, 2016) [D.I. 24].   On September 28, 2016, holders representing at least 50.01% of the aggregate outstanding principal amount of the Notes delivered an extension notice to the Debtor thereby extending the standstill under the Second Moratorium Scheme through November 30, 2016.

3.      Both the First and Second Moratorium Schemes were intended to provide the Debtor with the stability necessary to negotiate a comprehensive restructuring of its indebtedness, as set forth in a non-binding heads of terms (the "**Non-Binding Heads of Terms**") appended to the Second Moratorium Scheme, and preserve operations for the benefit of all stakeholders.  The Non-Binding Heads of Terms have not changed substantially.  The purpose of this Scheme is to implement a restructuring proposal (the "**Restructuring Proposal**") in relation to the Notes and PXF Facilities on the basis set forth in the Non-Binding Heads of Terms which has now been fully negotiated and documented pursuant to the Scheme.

*The Debtor*

A.      Business of the Debtor

4.      The Debtor and its subsidiaries (the "**Metinvest Group**") are, collectively, the largest vertically integrated mining and steel business in Ukraine, operating assets in each stage of the production chain from iron ore mining and processing, coking coal mining and coke production, through to semi-finished and finished steel production, pipe and coil rolling and production and manufacturing other value-added products.

5.     The Debtor was incorporated under the laws of the Netherlands on May 21, 2001 and is the ultimate holding company of the Metinvest Group.  As a holding company, its primary assets consist of its shares in its subsidiaries, intercompany receivables, and cash in its bank accounts.  The Debtor has no revenue generating operations of its own, and therefore its cash flow and ability to service its indebtedness are dependent on the operating performance and financial condition of its operating subsidiaries.[6]

B.     Operations

6.     The Metinvest Group's business is divided into two principal divisions: (i) metallurgical and (ii) mining.  For the six months ended June 30, 2016, the metallurgical segment accounted for approximately 61% of the Metinvest Group's external revenues, while the mining segment accounted for 39% of the Metinvest Group's external revenues.

i.     *The Metallurgical Division*

7.     The metallurgical division is responsible for the Metinvest Group's steel and coke products.  Its principal products include (i) finished steel products such as flat and long steel products and pipes, (ii) semi-finished steel products such as pig iron, slabs and billets, and (iii) coke.  The metallurgical division is comprised of thirteen key subsidiaries:

- Ilyich I&SW - the fourth largest Ukrainian integrated steel producer, according to Metal Expert;

- Azovstal - the third largest Ukrainian steel producer, accourding to Metal Expert;

- Yenakiieve I&SW - a fully integrated steel producer located in Ukraine;

- Makiivka Steel - a producer of shapes and bars located in Ukraine;

---

[6]     An organizational chart detailing the structure of the Metinvest Group is attached as Exhibit E to the Guyder Declaration.

- Khartsyzk Pipe - a producer of large diameter pipes located in Ukraine;

- Ferriera Valsider - a producer of plates and coils located in Italy;

- Promet Steel - a producer of shapes and bars located in Bulgaria;

- Metinvest Trametal and Spartan UK - producers of plates located in Italy and in the United Kingdom, respectively;

- Avdiivka Coke, Donetsk Coke and Zaporizhia Coke - producers of coke and chemicals located in Ukraine; and

- Inkor Chemicals - a producer of refined naphthalene and phenol and cresol products located in Ukraine.

8.      The Debtor's steel production business is conducted primarily through these subsidiaries.  The metallurgical division also comprises Metinvest-Resource, a scrap metal company.  In the six months ended June 30, 2016, the metallurgical division's external revenues and adjusted EBITDA were $2.3 billion and $401 million, respectively.[7]

ii.      *The Mining Division*

9.      The Debtor's mining division encompasses its iron ore and coal mining businesses. The Debtor's key products in this division are merchant iron ore concentrate and pellets, and coking coal concentrate.   The Debtor has five key subsidiaries in the mining division:

- Northern GOK and Ingulets GOK - the second and third largest iron ore mining companies in Ukraine by production volume in 2015, according to Metal Expert;

- Central GOK - the sixth largest iron ore mining company in Ukraine by production volume in 2015, according to Metal Expert;

- Komsomolske Flux Plant - a producer of fluxing limestone located in the Donetsk region of Ukraine;

---

[7]      All amounts are denoted in USD unless explicitly stated otherwise.

- <u>Krasnodon Coal</u> – a producer of coking coal located in the Luhansk region of Ukraine; and

- <u>United Coal Company</u> - a producer of coking coal based in the United States.

In the six months ended June 30, 2016, the mining division's external revenues and adjusted EBITDA were $590 million and $255 million, respectively.

    iii.    *Trading and Logistics*

       10.    The Debtor's trading and logistical assets serve both the metallurgical and mining divisions.  The Debtor sells steel, iron ore and coke and coal products to international markets in Europe, the Middle East, North Africa and South East Asia through Metinvest International S.A., to the Ukrainian market through Metinvest Ukraine and Metinvest-SMC; and to Commonwealth of Independent States markets (primarily Russia and Belarus) through Metinvest Ukraine, Metinvest Eurasia and Metinvest Distribution.  In addition, Metinvest-Shipping, a company based in Mariupol, Ukraine provides transportation and forwarding services for the Debtor's cargoes by railway and for their transhipment via sea ports. Belgorodmetallosnab provides warehouse and transhipment services for the Debtor in Russia.

    C.    <u>Ownership</u>

       11.    The Debtor is owned 71.24% by System Capital Management Limited (Cyprus) ("**SCM**"), a holding company registered in Cyprus, and 23.76% by the group of companies related to the Smart-Holding ("**SMART**"), a group of companies controlled directly or indirectly by Mr. Vadym Novynsky.  The remaining 5% has been acquired from the previous owners of the Ilyich Group,[8] which the Debtor acquired in 2010, for the benefit of SCM and SMART.  SCM is a member of the SCM Group, which is one of Europe's leading industrial

---

[8]    The Ilyich Group was comprised of Ilyich Iron and Steel Works and Ilyich-Steel.

groups with controlling interests in over 100 companies operating in the energy, finance, telecommunications, oil, clay mining, retail, real estate, media, agricultural, transportation and engineering sectors.  SMART is a diversified holding company with holdings in metals and mining, oil and gas, banking, agriculture, ship building and real estate.

D.      Debt Structure

12.      The Debtor's primary obligations are (i) three series of Eurobond notes issued on May 20, 2010, February 14, 2011, and November 28, 2014 with an aggregate outstanding amount of approximately $1.19 billion (the "**Notes**");[9] and (ii) four pre-export finance facilities obtained in 2011, 2012, and 2013 with an aggregate outstanding amount of approximately $1.1 billion (the "**PXF Facilities**").[10]

13.      The Notes are unsecured obligations of the Debtor ranking *pari passu* as among themselves and have the benefit of suretyships issued on a joint and several basis by certain of the Debtor's subsidiaries located in Ukraine (the "**Guarantors**").[11]  The Notes also have the benefit of suretyships granted by Ilyich I&SW by way of deed poll in favor of the 2016 Notes Trustee, the 2017 Notes Trustee and the 2018 Notes Trustee (each term as defined below) dated April 1, 2016 to guarantee the due payment of all sums expressed to be payable by the Debtor under the applicable series of Notes and the provisions of the applicable trust deed insofar as they relate to those Notes.

---

[9]      Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the First Moratorium Scheme.

[10]     Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the PXF Standstill Agreement (as defined below).

[11]     The Guarantors include the following entities: Avdiivka Coke Plant, Ingulets Iron Ore Enrichment Works, Khartsyzsk Pipe Plant, Central Iron Ore Enrichment Works, Northern Iron Ore Enrichment Works, Azovstal Iron & Steel Works, Yenakiieve Iron and Steel Works, and Metalen.

14.     The Notes are governed by English-law trust deeds (the "**Trust Deeds**") with BNY Mellon Corporate Trustee Services Limited acting as trustee for the 2016 Notes (as defined below) (the "**2016 Notes Trustee**") and GLAS Trust Corporation Limited acting as trustee for the 2017 Notes (as defined below) (the "**2017 Notes Trustee**") and the 2018 Notes (as defined below) (the "**2018 Notes Trustee**," and together with the 2016 Notes Trustee and the 2017 Notes Trustee, the "**Trustees**").   The notes issued on May 20, 2010, were issued in an aggregate principal amount of $500 million (approximately $90 million remains outstanding),[12] bear an interest rate of 10.25% and matured on January 31, 2016 (the "**2016 Notes**"); the notes issued on February 14, 2011 were in an aggregate principal amount of $750 million (approximately $792 million remains outstanding),[13] bear an interest rate of 8.75%, and mature on February 14, 2018 (the "**2018 Notes**"), and the notes issued on November 28, 2014 were in an aggregate amount of approximately $289.7 million (approximately $305 million remains outstanding),[14] bear an interest of 10.50% and are due and payable in four equal installments the first two of which fell due on May 28, 2016 and November 28, 2016, and remain unpaid, with the remaining installments falling due on May 28, 2017 and November 28, 2017 (the "**2017 Notes**").

15.     The PXF Facilities are governed by English law facility agreements with Deutsche Bank AG, Amsterdam Branch acting as facility agent (the "**Facility Agent**").   The PXF Facilities are syndicated with total issuances of $1 billion (approximately $522 million

---

[12]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the First Moratorium Scheme.

[13]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the First Moratorium Scheme.

[14]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the First Moratorium Scheme.

remains outstanding),[15] $325 million (approximately $50 million remains outstanding),[16] $560 million (approximately $226 million remains outstanding),[17] and $300 million (approximately $308 million remains outstanding),[18] extended pursuant to four separate facility agreements dated August 4, 2011, May 25, 2012, November 21, 2012, and November 13, 2013 respectively. The PXF Facilities provide for monthly amortization installments and have the benefit of bank account pledges, security over sales proceeds, and suretyships from InGok and Ilyich I&SW.

16.    In addition to the Notes and PXF Facilities, the Debtor is liable for other obligations including: (i) a loan agreement with Deutsche Bank AG insured by Euler Hermes Export Credit Agency, dated August 6, 2012, for an initial aggregate amount of approximately €24.6 million of which approximately €18 million remains outstanding (the "**ECA Facility**"),[19] (ii) certain seller notes (the "**Seller Notes**") with $89.6 million[20] outstanding issued by Metinvest U.S. Inc. and United Coal Company LLC ("**UCC**") and guaranteed by the Debtor in conjunction with Metinvest U.S. Inc.'s acquisition of UCC in April 2009;[21] (iii) two non-bank loans obtained from shareholder affiliates of the Debtor in 2014 with approximately $422 million in aggregate

---

[15]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the PXF Standstill Agreement (as defined below).

[16]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the PXF Standstill Agreement (as defined below).

[17]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the PXF Standstill Agreement (as defined below).

[18]   Amount calculated as of November 30, 2016 and includes capitalization of unpaid interest in accordance with the PXF Standstill Agreement (as defined below).

[19]   Amount calculated as of November 30, 2016.

[20]   Amounts calculated as of January 4, 2017.

[21]   On January 10, 2015, UCC, Metinvest U.S. Inc. and other relevant parties entered into extension documentation with the holders of the Seller Notes and extended the maturity of the Seller Notes to the end of 2016. Under the new terms and conditions, the outstanding amount of the Seller Notes were to be repaid during 2016 in 12 equal monthly installments commencing January 31, 2016. From January 2016 to January 2017, the Debtor was in negotiations with the holders of the Seller Notes regarding a further rescheduling of the repayment. During this period, the Debtor received signed waivers from the holders of the Seller Notes in relation to the non-payment of principal installments. On January 4, 2017, a restructuring of the Seller Notes came into effect. Under the amended terms of the Seller Notes, the maturity date has been extended to December 31, 2021, with monthly amortization payments.

outstanding (the "**Shareholder Loans**");[22] and (iv) the Debtor has various short term borrowings from Metinvest International S.A., advanced between September 2014 and January 2015 which matured on June 30, 2016 but was rescheduled until December 31, 2016 (the "**MISA Loan**").[23] The Metinvest Group also relies on various short-term trade finance facilities for purchases of inventory and receivables.[24]

E.   Establishment in the United Kingdom

17.   The Debtor is organized under the laws of the Netherlands and conducts its business with customers throughout the world through various operating subsidiaries primarily located in Ukraine.  The Debtor has a branch office, the Metinvest B.V. UK Branch (the "**UK Branch**"), with operations located in London.  The UK Branch:

- is registered at the Companies House of England and Wales;[25]

- has office space leased by the Debtor from SCM Advisors Limited located at 25 Park Lane, London, W1K 1RA, UK (the "**London Office**"), which lease includes the supply of utilities, necessary goods and services for the commercial operation of the London Office, including the procurement of office equipment, computers, and various telecommunications systems to integrate the UK Branch with the Metinvest Group and its global customer base;

- has a local bank account; and

---

[22]   Amount calculated as of November 30, 2016.  On April 1, 2016 the Debtor, Rainwell Limited and Eltrano Investments Limited entered into certain arrangements the effect of which granted turnover subordination of the Shareholder Loans pro rata in respect of the aggregate principal (including capitalized or compounded interest, as the case may be) amounts outstanding under the Notes and the PXF Facilities as of February 15, 2016.  These subordination arrangements expired on November 30, 2016.  The delivery of revised and permanent subordination agreements is a condition precedent to implementation of the Scheme on the Scheme Settlement Date.  Accordingly, the Shareholder Loans are not subject to the Scheme.

[23]   If the Scheme is implemented, the Debtor anticipates that the MISA Loan will be further rescheduled to a date on or after the Termination Date so the MISA Loan is not subject to the Scheme.

[24]   The various trade finance facilities are drawn primarily by Metinvest International S.A., the main operating subsidiary of the Metinvest Group.  The trade finance facilities are short term, uncommitted, can be cancelled by the relevant banks on very short notice and do not permit redrawing amounts.  Further, they are secured by pledges of inventories and/or assignment of export proceeds.  Accordingly, the trade finance facilities are not subject to the Scheme.

[25]   The UK Branch is registered with establishment number BR017685.

- serves as the principal office for its Project Manager who provides corporate finance treasury services and additional services overseeing the restructuring and ongoing management of the Debtor's liabilities pursuant to a service agreement between the Debtor and Metinvest International S.A., a Swiss subsidiary of the Debtor.

The Debtor also owns (directly or indirectly) three English operating subsidiaries: Spartan UK Limited, Metinvest Investments Limited, and Metinvest Capital UK Limited.

18.     Further, the Notes are all governed by English law, as are the Trust Deeds and suretyships associated with the Notes, and each of the Trustees is located in London. Indeed, virtually every aspect of the Notes is governed by English law.  If there is a dispute over the Trustees' compensation, it is to be decided by an expert selected by the President of The Law Society of England and Wales.  Moreover, the 2017 Notes and the 2018 Notes are governed by arbitration clauses calling for arbitration "under the London Court of International Arbitration, Arbitration Rules" and providing that the location of any arbitration "shall be London, England and the language of the arbitration shall be English."  In addition, under the 2016 Notes and the 2018 Notes, the relevant Trustee has the option of proceeding by way of litigation, in place of arbitration.  In connection with this option, the Debtor has irrevocably submitted to jurisdiction in England before English courts.  Similarly, each of the PXF Facilities is governed by English law and the Debtor submits to the jurisdiction of the English courts.  Under all four of the agreements, arbitration of any dispute is to be conducted in London, under the rules of the London Court of International Arbitration.  In addition, all of the suretyships related to the PXF Facilities are governed by English law and incorporate the arbitration and jurisdiction clauses from the corresponding PXF Facility.  Finally, the Foreign Representative was duly appointed by the High Court in London.[26]

---

[26]   *See* Expert Report of Professor Stephen J. Lubben attached as Exhibit D to the Guyder Declaration.

*Financial Difficulties*

19.     A significant portion of the Metinvest Group's assets is located in Ukraine.  The substantial and on-going civil disturbances and political instability, and military action in the country since the end of 2013 have negatively impacted Ukraine's economy, and as a result, the Metinvest Group's business, results of operations and financial condition.  These events have: (i) damaged and destroyed transport infrastructure, disrupting deliveries of raw materials and shipments of finished goods from some of the Metinvest Group's plants and even resulted in the death of at least one employee at a plant as a result of military shelling; (ii) caused production volumes of steel, iron ore, coke and coal products to decline; and (iii) affected economic activity and, as a result, domestic demand for steel and iron ore products.  In addition, the Metinvest Group has suffered from the protracted depressed market prices for coal and iron ore throughout much of 2014 and into 2015.  Since the first quarter of 2016, steel, iron ore and coking coal prices have recovered to some extent but have remained volatile and remain well below pre-2014 prices.  The Debtor, in line with a number of other market participants, does not expect the recent limited recovery in prices to be sustainable in the medium term.  Further, the Debtor has been unable to obtain funding at this time from the international capital and debt markets to refinance existing indebtedness.  The combination of decreased earnings from operations and the inability to raise new capital has created a liquidity crisis for the Debtor.  The Debtor does not expect any material and sustainable improvement in its overall liquidity before 2018.

***Restructuring Efforts***

    A.    <u>Defaults under the PXF Facilities and the Notes</u>

    20.    As a consequence of the continued civil disturbances, political instability, and depressed market prices for iron ore and steel, as well as an inability to refinance its debts through the international capital markets, the Debtor has been unable to pay in full the monthly amortization installments under the PXF Facilities since February 10, 2015 causing payment defaults under the PXF Facilities in a total amount of approximately $932 million[27] (the "**PXF Defaults**") and providing grounds for the lenders under the PXF Facilities (the "**PXF Lenders**") to accelerate all amounts outstanding under the PXF Facilities.  The Debtor is liable to make further scheduled debt repayments under its PXF Facilities from November 30, 2016 to January 31, 2017 totaling approximately $14 million, unless the Restructuring Proposal is implemented prior to that date.

    21.    Due to cross default provisions in the Notes, which provide that a payment default in an amount equal to or exceeding $50 million is an event of default under the Notes, the PXF Defaults caused the Debtor to be in default with respect to the Notes and the additional non-payment defaults and corresponding cross defaults set forth in this paragraph have occurred and are continuing in relation to the Notes (the "**Notes Defaults**" together with the PXF Defaults, the "**Defaults**").[28]  Following the non-payment of the principal amount of the 2016 Notes which fell due on January 31, 2016, a payment default is currently outstanding in respect of the 2016 Notes and corresponding cross defaults occurred under the 2017 Notes and the 2018 Notes.  Additional

---

[27]    Amount calculated as of November 30, 2016.

[28]    The Defaults also caused cross-defaults under the ECA Facility, which were initially waived until June 30, 2015 and then extended several times until February 28, 2017.  A principal payment under the ECA Facility in the amount of approximately €1.5 million fell due on December 27, 2016.  The Debtor does not consider that the lender under the ECA Facility is subject to the Scheme.

payment defaults occurred on May 28, 2016 and November 28, 2016 by virtue of the non-payment of the installment of principal due on the 2017 Notes.[29]  The Notes Defaults rendered the Notes susceptible to acceleration by the relevant Trustee in its sole discretion, upon the request of one-fifth of the outstanding holders of the relevant Notes, or pursuant to an extraordinary resolution of the relevant Noteholders.  Under the Second Moratorium Scheme, Noteholders were prevented from taking enforcement action in respect of certain declared events of default under the Notes until November 30, 2016 unless agreed scheme termination events occurred, which they did not.

22.    On December 1, 2015 the Debtor entered into a standstill agreement (effective as of December 22, 2015) with approximately 84% of the PXF Lenders (the "**PXF Standstill**") which provided for forbearance on enforcement action or the initiation of insolvency proceedings by the PXF Lenders who signed the PXF Standstill until January 29, 2016.  The PXF Standstill Agreement was extended in accordance with its terms through a series of extension agreements through November 30, 2016.

B.    The Restructuring Proposal

23.    The Debtor first circulated a proposal to restructure its outstanding obligations under the PXF Facilities and Notes on November 20, 2015.  Negotiations with the PXF Lenders and holders of the Notes have been on-going and significant progress was made during the moratorium obtained from the First Moratorium Scheme and the PXF Standstill. Indeed, on May 24, 2016, the Debtor agreed to the Non-Binding Restructuring Heads of Terms

---

[29]    The remaining installments fall due on May 28, 2017 and November 28, 2017.

with an ad hoc committee of Noteholders (the "**Noteholder Committee**") and a coordinating committee of PXF Lenders (the "**PXF Co-ordinating Committee**").[30]

24.     Following sanction of the Second Moratorium Scheme and further extension of the PXF Standstill, the Debtor has been working with the advisers to the Noteholder Committee and the PXF Co-ordinating Committee on the documentation and implementation of the Restructuring Proposal.  On December 23, 2016, the Debtor, the Noteholder Committee and the PXF Co-ordinating Committee agreed to substantially final forms of the principal documentation required to implement the Restructuring Proposal.  The terms and conditions of the New Notes, the Amended and Restated PXF Facility, and related documents, in their latest draft forms were made publicly available on the Scheme Website and disseminated to the PXF Lenders via the Facility Agent.

C.     The Lock-Up Agreements

25.     On December 23, 2016 the Debtor announced that it had entered into the lock-up agreement with certain members of the Noteholder Committee (the "**Noteholder Lock-Up Agreement**") pursuant to which, among other things, Noteholders who become a party to the Noteholder Lock-Up Agreement agree to support and vote (or instruct any proxy appointed by it to vote) in favor of the Scheme.  The Debtor invited the remaining Noteholders to accede to the Noteholder Lock-Up Agreement.   In exchange for performing its obligations under the Noteholder Lock-Up Agreement, each Noteholder who has entered into the Noteholder Lock-up Agreement by January 16, 2017 (a "**Deadline Consenting Noteholder**") is offered a lock-up fee in an amount of U.S $7.50 per U.S. $1,000 of the aggregate outstanding amount of their Notes

---

[30]     As at November 30, 2016, the Noteholder Committee held in aggregate approximately 42% of the outstanding Notes by value (based on the principal amount of Notes outstanding as at November 30, 2016).   As at December 31, 2016, the PXF Co-ordinating Committee held approximately 61.45% of the aggregate amount outstanding under the PXF Facilities.

that became subject to the Noteholder Lock-Up Agreement and which are held by that Noteholder as at the record date for voting under the Scheme and an additional fee if Deadline Consenting Noteholders holding Notes with a principal value of more than 75% of the Notes held by all Noteholders on January 16, 2017 have entered into the Noteholder Lock-up Agreement by January 16, 2017. As at January 16, 2017, Noteholders representing in aggregate approximately 87% of the outstanding Notes by value have signed or acceded to the Noteholder Lock-Up Agreement.

26. The Debtor also announced on December 23, 2016 that it had entered into a lock-up agreement with certain members of the PXF Co-ordinating Committee (the "**PXF Lock-up Agreement**") pursuant to which, among other things, PXF Lenders who become a party to the PXF Lock-Up Agreement agree to support and vote (or instruct any proxy appointed by it to vote) in favor of the Scheme. The Debtor encouraged any remaining PXF Lenders to accede to the PXF Lock-Up Agreement. In exchange for performing its obligations under the PXF Lock-Up Agreement, each PXF Lender who has entered into the PXF Lock-Up Agreement by January 16, 2017 (a "**Deadline Consenting PXF Lender**") is offered a lock-up fee in an amount of U.S $7.50 per U.S. $1,000 of the aggregate debt outstanding under the relevant PXF Facility that became subject to the PXF Lock-Up Agreement and which is held by that PXF Lender as at the record date for voting under the Scheme and an additional fee if Deadline Consenting PXF Lenders holding PXF debt with a principal value of more than 75% of the PXF debt held by all PXF Lenders on January 16, 2017 have entered into the Noteholder Lock-up Agreement by January 16, 2017. As at January 16, 2017, PXF Lenders representing in aggregate approximately 99% of the outstanding PXF Facilities by value have signed or acceded to the PXF Lock-Up Agreement.

*The Scheme*[31]

27.     The objective of the Scheme is to implement a restructuring of the Notes and the PXF Facilities.  If the Scheme is implemented, the Debtor anticipates that it will be able to repay the full amount due to the Notes in accordance with the terms of the new notes issued under the Scheme (the "**New Notes**") and the full amount due to the PXF Lenders in accordance with the terms of the amended and restated PXF Facility under the Scheme (the "**Amended and Restated PXF Facility**").  The Scheme will affect all Noteholders and the Trustees (the "**Notes Scheme Creditors**") and all PXF Lenders (the "**PXF Scheme Creditors**").  All Scheme Creditors, including those who do not vote in favor of the Scheme, will be bound by the terms of the Scheme, along with the Debtor.

28.     Under the Scheme, the Notes will be cancelled and each Noteholder will be entitled to receive an amount of a single issue of New Notes (subject to rounding) equal to (a) the original principal amount of the Notes held by that Noteholder on the Scheme Settlement Date; (b) the capitalized interest outstanding in respect of such Notes to, but excluding, the Scheme Settlement Date after deduction of the amount (if any) of capitalized interest outstanding in respect of the Existing Notes held by that Notes Scheme Creditor which the Debtor elects to pay to Notes Scheme Creditors on the Scheme Settlement Date (the "**Scheme Settlement Date Notes Capitalization Payment**"); and (c) the accrued unpaid and uncapitalized interest in respect of such Notes to, but excluding, the Scheme Settlement Date after deduction of the Notes Cash Pay Interest (as defined below) in respect of such Notes.  In addition, each Noteholder will be entitled to be paid a restructuring fee by the Debtor in an amount equal to 75 bps on the

---

[31]  The summary of the Scheme provided in this section is for informational purposes only and is qualified in its entirety by the terms of the Scheme and the *Explanatory Statement in Relation to the Scheme* annexed as Exhibit F to the Guyder Declaration.

01:21439874.1

aggregate Scheme Settlement Date Notes Outstandings of all Noteholders less the amount of the Initial Scheme Consideration.

29.     Further, on the Scheme Settlement Date each Noteholder will also receive at least 30% of the accrued but unpaid interest (whether or not then due and payable under the relevant terms and conditions of the Existing Notes) in respect of the Existing Notes held by that Notes Scheme Creditor for the period from and including the last Determination Date before the Scheme Settlement Date to, but excluding, the Scheme Settlement Date (the "**Notes Cash Pay Interest**") and its Scheme Settlement Date Notes Capitalization Payment (if any).

30.     Similarly, the PXF Facilities will be replaced by a single Amended and Restated PXF Facility and each PXF Lender will be entitled to receive a participation in the Amended and Restated PXF Facility (subject to rounding) equal to (a) the aggregate principal amount of that PXF Scheme Creditor's participation in each Existing PXF Facility (other than the Existing PXF Facility Compounded Interest) held by that PXF Scheme Creditor on the Scheme Settlement Date; (b) interest (including default interest) that has previously accrued on that PXF Scheme Creditor's participation in the Existing PXF Facilities (including any amounts that have previously been compounded) but excluding any amounts which, as at that time, (i) have not yet become due and payable, or (ii) are no longer outstanding (the "Existing PXF Facility Compounded Interest") to, but excluding, the Scheme Settlement Date after deduction of the amount (if any) of the Existing PXF Facility Compounded Interest which the Debtor elects to pay to PXF Scheme Creditors on the Scheme Settlement Date (the "**Scheme Settlement Date PXF Capitalisation Payment**"); and (c) the accrued unpaid and uncapitalized interest (including default interest) in respect of such participations in the Existing PXF Facilities to, but excluding, the Scheme Settlement Date after deduction of the PXF Cash Pay Interest (as defined below).  In

addition, each PXF Scheme Creditor will be entitled to be paid a restructuring fee by the Debtor

in an amount equal to 75 bps on the aggregate Scheme Settlement Date PXF Outstandings of all

PXF Scheme Creditors less the amount of the Initial Fee.

31.     Further, on the Scheme Settlement Date each PXF Lender will receive at

least 30% of the accrued but unpaid interest (including default interest, whether or not

compounded and whether or not then due and payable under the relevant Existing PXF Facility)

under the Existing PXF Facilities for the period from and including the last Determination Date

before the Scheme Settlement Date to, but excluding, the Scheme Settlement Date (the "**PXF

Cash Pay Interest**") and its Scheme Settlement Date PXF Capitalisation Payment (if any).  In

addition to the restructuring fees described here, each Noteholder and each PXF Lender that has

signed or acceded to the Noteholder Lock-Up Agreement or, as the case may be, the PXF Lock-

Up Agreement prior to the relevant deadline will receive the fees provided thereunder provided

that it has complied with its obligations under the relevant lock-up agreement.

32.     The key terms of the Restructuring Proposal embodied in the Scheme are

as follows:

- an extension of the maturity date of each series of Notes and the PXF Facilities as set out below:

| Debt | Original Maturity Date | Extended Maturity Date |
|---|---|---|
| 2016 Notes | January 31, 2016 | June 30, 2021 |
| 2017 Notes | November 28, 2017 | June 30, 2021 |
| 2018 Notes | February 14, 2018 | June 30, 2021 |
| PXF Facility dated August 4, | August 10, 2016 | June 30, 2021 |

| 2011 | | |
|---|---|---|
| PXF Facility dated May 25, 2012 | May 10, 2012 | June 30, 2021 |
| PXF Facility dated November 21, 2012 | November 10, 2015 | June 30, 2021 |
| PXF Facility dated November 13, 2013 | November 10, 2018 | June 30, 2021 |

- the coupon payable under the New Notes will be increased to 10.875 per cent compared to the weighted average coupon of 9.3 per cent payable under the Notes as of 31 December 2015 (before capitalization under the First Moratorium Scheme and the Second Moratorium Scheme);

- during an initial period beginning on the implementation of the restructuring until December 31, 2018, the Debtor will pay 30% of the interest due under the Amended and Restated PXF Facility and, in respect of the New Notes, will pay approximately 30% of the weighted average coupon under the Notes, in each case in cash, with the remainder to be capitalized and/or paid in cash pursuant to a cash sweep mechanic based on unrestricted cash balances of the Metinvest Group;

- from January 1, 2019 ("**Period 2**"), the entire amount of the coupon and interest due under the New Notes and the Amended and Restated PXF Facility will be paid in cash;

- in Period 2, the Amended and Restated PXF Facility will benefit from scheduled amortization;

- the Shareholder Loans and other liabilities of the Metinvest Group to the shareholders of the Debtor and their affiliates will be subordinated to the New Notes and the Amended and Restated PXF Facility;

- the security and guarantee package in favor of the Amended and Restated PXF Facility and the New Notes will be improved, including pledges on shares of material operating companies and asset security; and

- there will be limitations on dividends and other payments to shareholders and a tightening of the covenant packages under the New Notes and the Amended and Restated PXF Facility.

33.     For the avoidance of doubt, there will be no debt write off of either the Notes or the PXF Facilities.  However, existing defaults under the Notes and the PXF Facilities will be waived, the rights of Scheme Creditors to take actions in respect of such defaults will be released, and such waiver and release will become operative on the effective date of the Scheme. The Scheme does not purport to restructure any liabilities of the Metinvest Group other than the Notes and the PXF Facilities, and related guarantee and suretyship obligations, or affect any creditors other than Noteholders and the PXF Lenders, a substantial majority of whom have already signed on to vote in favor of the Scheme pursuant to the Lock-Up Agreements.

34.     As at November 30, 2016 the Debtor had outstanding indebtedness under the Notes and the PXF Facilities which was overdue of an aggregate amount of approximately $1.2 billion.  If the Debtor is successful in implementing the Restructuring Proposal the Debtor anticipates that it will be able to repay the full amount due to the Notes Scheme Creditors and the PXF Scheme Creditors in accordance with the Scheme and pursuant to the terms of the New Notes and the Amended and Restated PXF Facility, respectively.

35.     Failure to implement the Scheme could have dire effects on the Debtor and its creditors.  The Debtor would likely run out of liquidity due to a cessation of trade finance and supplier credit, and the operating entities of the Metinvest Group, most of which are based in Eastern Ukraine, may be forced to shut down some or all of their production facilities causing long lasting damage to the business and more likely leading them to cease trading.  In that event, the Debtor would need to consider filing for protective proceedings in the Netherlands, and certain creditors may be able to commence bankruptcy proceedings in the Netherlands or elsewhere.  If the Dutch courts granted the Debtor a suspension of payments, this would provide the Debtor only a short window to seek to agree a restructuring.  However, there is a substantial

risk that with multiple insolvency proceedings, the Metinvest Group would lose the majority, if not all, of its trade finance facilities and supplier credit, effectively eliminating its liquidity. This could set the stage for a Ukrainian protective bankruptcy proceeding which may result in either distressed asset sales or the assets being nationalized. Such distressed asset sales would likely be at forced sale values and materially lower than a going concern value due to the very limited buyers, if any, in the currently volatile Ukrainian market. If the assets are nationalized, it is entirely uncertain how much value would be received. In both the sale and nationalization scenarios, however, there is a substantial risk that the Debtor will not be able to pay its creditors in full and it is unclear what the quantum or timing of distributions would look like.

***The English Proceeding***

36.    The Debtor commenced the English Proceeding by filing claim forms in respect of the Scheme with the High Court on January 16, 2017, and the Foreign Representative was appointed by the Debtor to act as foreign representative in any chapter 15 case commenced in the United States in respect of the Debtor.[32]   On January 17, 2016, following a hearing (the "**Convening Hearing**"), the High Court entered the Convening Order which, among other things: (i) authorized the Debtor to hold the Scheme Meetings for the purposes of considering and approving the Scheme by the Scheme Creditors, (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meetings, be made available to Scheme Creditors; and (iii) ordered that the Foreign Representative shall be appointed to act as a foreign representative in this chapter 15 case. Specifically, the Convening

---

[32]    The Debtor issued the PSL on December 23, 2016 in accordance with the guidance set forth by the High Court in its Practice Statement dated April 15, 2002. The purpose of the PSL was, among other things, to advise creditors of the objective of the Scheme and the Debtor's intentions to formally commence the English Proceeding proposing the Scheme to Noteholders and the PXF Lenders. The PSL was posted to the Scheme Website (as defined below) and an announcement of the PSL was made on the Irish Stock Exchange with a reference to the Scheme Website.

Order authorized the Foreign Representative to apply to a United States Bankruptcy Court for an order enforcing the Scheme and granting any other related relief under chapter 15 of the Bankruptcy Code.[33]

37.    Shortly following the Convening Hearing, and in accordance with the Convening Order, notice of the Scheme Meeting, the Scheme, a voting form for the Notes Scheme Creditors (including guidance notes for the completing the voting form), and an explanatory statement (collectively, the "**Notes Restructuring Documents**") will be provided to the Notes Scheme Creditors via the Depository Trust Company, Euroclear and Clearstream Luxembourg.  In addition, copies of the Notes Restructuring Documents will be made available to the Notes Scheme Creditors by Lucid Issuer Services Limited as information agent under the Scheme at www.lucid-is.com/metinvest (the "**Scheme Website**").  Finally, availability of the Notes Restructuring Documents on the Scheme Website will be announced on the Irish Stock Exchange.

38.    Also following the Convening Hearing, and in accordance with the Convening Order, notice of the Scheme Meeting, the Scheme, a voting form for the PXF Scheme Creditors, and an explanatory statement (collectively, the "**PXF Restructuring Documents**") will be provided to the PXF Scheme Creditors by the Facility Agent.  The Existing PXF Facility Agent will upload these documents to Debt Domain, a service commonly used by syndicated lenders and facility agents for distribution by facility agents to members of a syndicate of information concerning their loans.

39.    The Scheme will become legally binding upon, *inter alia*, the following:

(a)    a vote in favor of the Scheme at both Scheme Meetings to be held in London on February 6, 2017 by a majority in number representing not less

---

[33]    Convening Order ¶ 28.

than 75% in value of each class of creditors (i.e., the PXF Scheme Creditors and Notes Scheme Creditors) present and voting either in person or by proxy at the relevant Scheme Meeting;

(b)     the issuance by the High Court of the Sanction Order; and

(c)     delivery of the Sanction Order to the Registrar of Companies in England and Wales.

40.     Following the Scheme Meetings, and upon receiving the necessary votes in favor of the Scheme, the High Court will conduct the Sanction Hearing.  In an effort to align this chapter 15 case with the timing of the overall restructuring process and prevent enforcement action by Noteholders and PXF Lenders, the Foreign Representative is seeking the relief requested in this Petition to be heard on or shortly after the date of issuance of the Sanction Order.

## **RELIEF SOUGHT**

41.     By this Petition, the Foreign Representative seeks the following relief:

(A)     recognition, pursuant to section 1517 of the Bankruptcy Code, of the English Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code;

(B)     enforcement of the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code; and

(C)     such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521, of the Bankruptcy Code.

## BASIS FOR SUCH RELIEF

42.     For the reasons more fully discussed in the *Memorandum of Law* filed contemporaneously herewith, the English Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

(A)     the English Proceeding is (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code because the English Proceeding is located in a jurisdiction where the Debtor maintains an "establishment" within the meaning of section 1502(2) of the Bankruptcy Code;

(B)     the Foreign Representative is a "person" within the meaning of section 101(41) of the Bankruptcy Code and a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code;

(C)     the Petition was filed in accordance with sections 1504 and 1509 of the Bankruptcy Code; and

(D)     the Petition meets the requirements of sections 1504 and 1515 of the Bankruptcy Code.

43.     Further, the Scheme should be given full force and effect in the United States as either "additional assistance" under section 1507 of the Bankruptcy Code or "appropriate relief" under section 1521, as such enforcement is necessary to give effect to the Scheme with respect to Scheme Creditors taking action in the United States.

44.     Granting the requested relief would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code.  In fact, granting recognition will promote the United States public policy of respecting foreign

proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, the circumstances satisfy the conditions for mandatory recognition of the English Proceeding under section 1517 of the Bankruptcy Code and for the enforcement of the Scheme under sections 1507 and 1521 of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that this Court grant the Petition and enter the Proposed Order recognizing the English Proceeding as a "foreign nonmain proceeding" and giving full force and effect to the Scheme in the United States, and grant such other relief as the Court deems just and appropriate in the circumstances.

Dated: Wilmington, Delaware
      January 17, 2017

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: _/s/ Joseph M. Barry_____
Joseph M. Barry (Del. Bar No. 4221)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253
jbarry@ycst.com

-and-

**ALLEN & OVERY LLP**
Daniel Guyder
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
daniel.guyder@allenovery.com
mark.nixdorf@allenovery.com

_Attorneys for the Foreign Representative of the Debtor_

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Svitlana Romanova declares as follows:

I am the Chief Legal Officer and a member of the Executive Committee of Metinvest Holding LLC, and have been authorized to act as foreign representative of Metinvest B.V. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**"). I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this *17th* day of January, 2017, in *Kiev, Ukraine*

Svitlana Romanova

**EXHIBIT A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No. 17-_____ (___) |
| Debtor in a Foreign Proceeding. | **Re: D.I. _____** |

### ORDER GRANTING RECOGNITION AND RELATED RELIEF

**THIS MATTER** was brought before the Court by Svitlana Romanova, the duly appointed foreign representative (the "**Foreign Representative**") of Metinvest B.V. (the "**Debtor**"), a private limited liability company incorporated under the laws of the Netherlands, in connection with a proceeding (the "**English Proceeding**") concerning a scheme of arrangement (the "**Scheme**") under part 26 of the English Companies Act 2006 (as amended, the "**English Companies Act**") currently pending before the High Court of Justice of England and Wales (the "**High Court**").

The Foreign Representative filed a *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**") on January 17, 2016 commencing the above captioned chapter 15 case under chapter 15 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and seeking the entry of an order (i) recognizing the English Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code and (ii) giving full force and effect to the Scheme, including any modifications or amendments thereof, in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code if such

---

[1] The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839. The address of the registered office of Metinvest B.V. is Nassaulaan 2A, 2514 JS, 'S-Gravenhage, The Netherlands.

Scheme is duly approved by the requisite majority of affected creditors and sanctioned by the High Court in accordance with the English Companies Act.

The Court has considered and reviewed the Petition and the other pleadings and exhibits submitted by the Foreign Representative in support thereof. After due deliberation and sufficient cause appearing therefor, the Court finds and concludes as follows:

(A)    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012, and section 1501 of the Bankruptcy Code.

(B)    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and the Court may enter a final order consistent with Article III of the United States Constitution.

(C)    Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3).

(D)    The Foreign Representative is a "person" within the meaning of 11 U.S.C. § 101(41) and is the duly appointed "foreign representative" of the Debtor within the meaning of 11 U.S.C. § 101(24).

(E)    The chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1509, and the Petition meets the requirements of 11 U.S.C. §§ 1504 and 1515.

(F)    The English Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

(G)    The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

(H)    The English Proceeding is before the High Court in London, England, where the Debtor has an "establishment" within the meaning of 11 U.S.C. § 1502(2), and therefore constitutes a "foreign nonmain proceeding" pursuant to 11 U.S.C. § 1502(5) and is entitled to recognition as such pursuant to 11 U.S.C. § 1517(b)(1).

(I)    The Foreign Representative is entitled to discretionary relief pursuant to 11 U.S.C. §§ 1507 and 1521.

(J)    The relief granted herein is necessary and appropriate, in the interest of the public and international comity, and consistent with the public policy of the United States.

01:21439915.1

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The English Proceeding is hereby recognized as a foreign nonmain proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

2.      The Scheme, including any amendments or modifications, is hereby given full force and effect in the United States pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code.

3.      This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

4.      The Petition and supporting papers shall be available upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 to the attention of Mark Nixdorf, (212) 610-6421, mark.nixdorf@allenovery.com.

5.      Notwithstanding Bankruptcy Rule 7062, made applicable to this chapter 15 case by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated: Wilmington, Delaware
        _____, 2017

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE